August 20, 2024

**Supreme Court**

No. 2022-282-Appeal.
(PC 15-3817)

Heather Blouin et al.          :

              v.              :

Divya Koster, M.D., et al.     :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Heather Blouin et al.                    :

v.                                       :

Divya Koster, M.D., et al.               :

Present: Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.** The plaintiffs, Jason Blouin, individually and as father and next friend of Q.B., X.B., and D.B.;[1] along with Heather Blouin, individually (collectively, plaintiffs), appeal from a Superior Court decision granting summary judgment in favor of the defendants, Divya Koster, M.D. (Dr. Koster); Joseph Singer, M.D. (Dr. Singer); Patricia Lynch-Gadaleta, PA-C; and Riverside Pediatrics, Inc. (Riverside Pediatrics) (collectively, pediatric defendants); and partial summary judgment in favor of the defendants, Karen L. McGoldrick, M.D. (Dr. McGoldrick); Santina L. Siena, M.D. (Dr. Siena); and University OB-GYN, Inc. (University OB-GYN) (collectively, obstetric defendants). The plaintiffs argue that (1) the trial justice erroneously determined that the pediatric defendants did not owe a duty of care to Heather Blouin (Mrs. Blouin) and Jason Blouin (Mr. Blouin)

---

[1] We refer to these plaintiffs by their initials because they were minors at the time the amended complaint was filed. We intend no disrespect.

- 1 -

(collectively, plaintiff-parents); and that (2) the trial justice erroneously determined that this Court's holding in *Ho-Rath v. Corning Incorporated*, 275 A.3d 100 (R.I. 2022) (*Ho-Rath III*), barred X.B. and D.B.'s individual claims.[2] For the reasons set forth in this opinion, we affirm the judgments of the Superior Court.

### Facts and Procedural History

We, as do the parties, take the following facts from the amended complaint and the statement of undisputed facts for purposes of the appeal before the Court. This matter arises out of a medical malpractice action related to the allegedly negligent births of X.B. and D.B., each of whom was born with cystic fibrosis, a life-shortening genetic disorder that causes severe damage to the lungs and digestive system. Heather Blouin and Jason Blouin are the parents of Q.B., X.B., and D.B., who were born in January 2006, September 2009, and September 2012 respectively. For each pregnancy, Mrs. Blouin received medical care and treatment at University OB-GYN.

Specifically, Dr. McGoldrick, an obstetrician and employee of University OB-GYN, provided medical care and treatment to Mrs. Blouin during and in between her pregnancies with Q.B. and X.B. The plaintiff-parents allege that Dr.

---

[2] At the hearing on the summary judgment motions, counsel for plaintiffs conceded that D.B. had not yet been conceived during the time period when Dr. Siena provided care and treatment to Mrs. Blouin; accordingly, D.B., by and through his father as next friend, does not challenge the portion of the trial justice's decision granting Dr. Siena's motion for summary judgment.

McGoldrick did not, at any time, offer them genetic screening or counseling related to the risks or consequences that could result from parents genetically passing a hereditary condition to their unborn children.

A few years after Q.B.'s healthy birth in 2006, Mrs. Blouin attended a routine visit at University OB-GYN and informed Dr. McGoldrick of her intent to conceive a second child. Dr. McGoldrick did not suggest or offer preconception screening or counseling to the Blouin family at this time.

In September 2009, Mrs. Blouin gave birth to X.B. Shortly thereafter, X.B.'s newborn screening test (NST), a screening tool used to assist in early detection of medical conditions, revealed nothing remarkable. However, over the next few years, X.B. frequently visited Riverside Pediatrics and sought treatment for various symptoms including a failure to thrive, diarrhea, a chronic cough, and nasal congestion. The record reveals that plaintiff-parents brought X.B. to Riverside Pediatrics upwards of fifteen times between October 2009 and December 2012. Although X.B.'s symptoms persisted, and worsened, during this period, he did not receive a diagnosis of cystic fibrosis until 2013.

On February 7, 2011, Mrs. Blouin saw Dr. Siena, a second obstetrician, for an annual appointment during which she informed Dr. Siena that she was planning to conceive a third child in the next three to four months. The plaintiffs allege that Dr. Siena did not offer preconception screening or counseling. In September 2012, Mrs.

- 3 -

Blouin gave birth to D.B. Due to D.B.'s NST revealing that he carried the cystic fibrosis gene mutation, pediatrician Dr. Koster recommended that he undergo a sweat test to determine whether he had elevated chloride levels, a well-known marker of cystic fibrosis in the medical community. Although D.B. underwent three separate sweat tests, which revealed elevated chloride levels, D.B.'s providers at Riverside Pediatrics did not diagnose him with cystic fibrosis.

In December 2012, Mrs. Blouin called pediatrician Dr. Singer to request that Q.B. and X.B. also undergo sweat testing, based on D.B.'s concerning test results. Although Q.B.'s sweat test did not raise concerns, X.B.'s sweat test showed elevated chloride levels. Thereafter, X.B. underwent a second sweat test revealing the same elevated chloride levels; however, he was not diagnosed with cystic fibrosis at that time.

On July 8, 2013, D.B. underwent an evaluation at the Rhode Island Hospital Division of Cystic Fibrosis, where specialists confirmed that he had cystic fibrosis and would need chest physical therapy to address his respiratory symptoms. Shortly thereafter, X.B. also underwent an evaluation, received a diagnosis of cystic fibrosis, and was referred for treatment to address his respiratory symptoms.

Following these diagnoses in 2013, Mrs. Blouin began to experience severe anxiety and distress in response to the increased needs of X.B. and D.B. and her

concerns about their health and well-being. Furthermore, after D.B.'s birth, plaintiff-parents learned that they are carriers of the cystic fibrosis gene.

The plaintiffs filed suit on August 31, 2015, and amended their complaint in 2016.[3] In their amended complaint, plaintiffs alleged that the obstetric defendants and the pediatric defendants were negligent in their diagnosis, treatment, and provision of genetic counseling with respect to the Blouin family's cystic fibrosis diagnoses; plaintiff-parents also alleged that they "would not have conceived [X.B.

---

[3] The plaintiffs' original complaint included claims against Linda Shalon, M.D., and her employer, Rhode Island Hospital. By stipulation of the parties, all claims against Dr. Shalon and Rhode Island Hospital have been dismissed. The amended complaint alleges thirty-six counts. Specifically, plaintiffs' claims include plaintiff-parents' wrongful-conception claim against Dr. McGoldrick (count 1); plaintiff-parents' wrongful-conception claim against Dr. Siena (count 5); plaintiff-parents' wrongful-conception claims against the pediatric defendants (counts 2, 3, and 4); X.B.'s wrongful-life claim against Dr. McGoldrick (count 6); D.B.'s wrongful-life claim against Dr. McGoldrick (count 7); D.B.'s wrongful-life claim against Dr. Siena (count 8); D.B.'s wrongful-life claims against the pediatric defendants (counts 9, 10, and 11); Mrs. Blouin's loss of consortium claims against the obstetric defendants (counts 12 and 13); Mrs. Blouin's loss of consortium claims against the pediatric defendants (counts 14, 15, and 16); Mr. Blouin's loss of consortium claims against the obstetric defendants (counts 17 and 18); Mr. Blouin's loss of consortium claims against the pediatric defendants (counts 19, 20, and 21); Q.B.'s loss of consortium claims against the obstetric defendants (counts 22 and 23); Q.B.'s loss of consortium claims against the pediatric defendants (counts 24, 25, and 26); Mrs. Blouin's respondeat superior claims against Riverside Pediatrics and University OB-GYN (counts 27 and 28); Mr. Blouin's respondeat superior claims against Riverside Pediatrics and University OB-GYN (counts 29 and 30); Q.B.'s respondeat superior claims against Riverside Pediatrics and University OB-GYN (counts 31 and 32); X.B.'s respondeat superior claims against Riverside Pediatrics and University OB-GYN (counts 33 and 34); and D.B.'s respondeat superior claims against Riverside Pediatrics and University OB-GYN (counts 35 and 36).

and D.B.]" had they received information about their status as cystic fibrosis carriers sooner; and they sought damages for the costs of extraordinary medical, psychological, education, residential, and other expenses that they have incurred and will continue to incur as a result of the alleged negligence by defendants. All defendants moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. A justice of the Superior Court heard and denied defendants' motions to dismiss, with the exception of plaintiff-parents' claims for wrongful-conception of X.B. against pediatricians Dr. Koster and Dr. Singer, due to plaintiff-parents' concession that these two providers could not be liable for X.B.'s birth because they did not begin treating him until after his birth. The Superior Court ultimately set a trial date for September 2022; however, the obstetric defendants moved for partial summary judgment in response to this Court's May 2022 opinion in *Ho-Rath III*, in which this Court determined "that there is no duty owed to a child born with physical defects who alleges that, because of negligence, his or her parents either (1) decided to conceive the child in ignorance of the risk of impairment, or (2) were deprived of information that would have caused them to terminate the pregnancy."[4] *Ho-Rath III*, 275 A.3d at 108. The pediatric defendants also filed a motion for summary judgment.

---

[4] Dr. McGoldrick sought summary judgment for X.B. and D.B.'s wrongful-life claims and the related derivative loss of consortium claims against her (counts 6, 7, 12, 17, and 22); Dr. Siena sought summary judgment for D.B.'s wrongful-life and

In support of their motions for summary judgment, both the pediatric defendants and the obstetric defendants argued that plaintiffs' wrongful-life claims, and the associated derivative claims for loss of consortium, were subject to dismissal based on *Ho-Rath III*. As to the wrongful-conception claims, the pediatric defendants drew the trial justice's attention to two key undisputed facts: (1) X.B., and not plaintiff-parents, or D.B., was the patient of the pediatric defendants during the time frame of the alleged negligence, and (2) plaintiff-parents have not claimed that they consulted with the pediatric defendants regarding genetic screening or prenatal care. Consequently, the pediatric defendants asserted that the duty owed to plaintiff-parents was to properly treat X.B. and to inform plaintiff-parents, as healthcare proxies, of the risks and benefits of treating X.B., rather than to provide genetic counseling to plaintiff-parents.

Conversely, plaintiffs asserted that the overlap between the time of the negligent acts and the existence of X.B. and D.B. as fetuses distinguished the factual background of their action from *Ho-Rath III*. Regarding the wrongful-conception claims, plaintiffs highlighted deposition testimony from an expert witness, Robert W. Mills, M.D., that pediatricians owe a duty to parents in cases such as this. Additionally, plaintiff-parents argued that the factors set forth in *Banks v. Bowen's*

derivative loss of consortium claims against her (counts 8, 13, 18, and 23); University OB-GYN sought summary judgment for the respondeat superior claims against it (counts 28, 30, 34, and 36).

- 7 -

*Landing Corp.*, 522 A.2d 1222 (R.I. 1987), sufficiently demonstrated a duty running from the pediatric defendants to plaintiff-parents.[5]

On July 26, 2022, the trial justice issued a bench decision granting the pediatric defendants' motion for summary judgment on all counts and granting the obstetric defendants' motions for partial summary judgment as to X.B. and D.B.'s claims of wrongful life against Dr. McGoldrick, D.B.'s claim of wrongful life against Dr. Siena, X.B. and D.B.'s related claims of respondeat superior against University OB-GYN, the derivative loss of consortium claims of plaintiff-parents and Q.B. against Dr. McGoldrick, the derivative loss of consortium claims of plaintiff-parents and Q.B. against Dr. Siena, and the derivative loss of consortium claims against University OB-GYN. The trial justice concluded that the pediatric defendants owed no legally cognizable duty to plaintiff-parents and that the wrongful-conception claims failed accordingly. Additionally, the trial justice determined that this Court's holding in *Ho-Rath III* controlled the outcome on

---

[5] The factors set forth in *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222 (R.I. 1987), include the following:

> "(1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." *Banks*, 522 A.2d at 1225.

defendants' motions for summary judgment as to the claims for wrongful life. Thereafter, the trial justice entered judgment in favor of the pediatric defendants and partial judgment in favor of the obstetric defendants pursuant to Rule 54(b); plaintiffs timely appealed to this Court.

On appeal, plaintiffs assign two errors: (1) the trial justice erred in failing to recognize the duty running from the pediatric defendants to plaintiff-parents, specifically the duty of informed consent and disclosure; and (2) the trial justice erred in failing to distinguish this case from the facts in *Ho-Rath III* and thereby dismissing the wrongful-life claims brought by X.B. and D.B.

## Standard of Review

This Court reviews a trial justice's decision granting summary judgment *de novo*. *Tiernan v. Magaziner*, 270 A.3d 25, 30 (R.I. 2022). "Although complaints sounding in negligence generally are not amenable to summary judgment and should be resolved by fact finding at the trial court, the existence of a duty is a question of law." *Berard v. HCP, Inc.*, 64 A.3d 1215, 1218 (R.I. 2013). In the absence of a showing by the plaintiff that a duty of care exists, the trial justice is left with no choice but to grant summary judgment. *Id*. Moreover, the nonmovant's burden to prove the existence of a genuine issue of material fact "cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions."

*DeCurtis v. Visconti, Boren & Campbell Ltd.*, 252 A.3d 765, 770 (R.I. 2021) (quoting *Credit Union Central Falls v. Groff*, 966 A.2d 1262, 1267 (R.I. 2009)).

**Analysis**

The plaintiffs' thirty-six-count amended complaint sounds in negligence. The counts at issue on appeal are premised on two theories of liability grounded in the duty of care allegedly owed to plaintiffs by various health care providers. First, plaintiff-parents contend that the pediatric defendants owed them a duty to timely diagnose X.B. with cystic fibrosis so that they, the biological parents of X.B., could make informed decisions about whether to have another child.[6] Second, X.B. contends that Dr. McGoldrick and University OB-GYN, whose medical care of Mrs. Blouin overlapped with X.B.'s existence as a fetus, owed him a duty to timely diagnose plaintiff-parents as cystic fibrosis carriers, or the fetus as afflicted with cystic fibrosis;[7] and D.B. contends that the pediatric defendants, whose medical care

---

[6] Q.B. also asserts derivative claims for damages against the pediatric defendants pursuant to this theory of liability.

[7] We recognize that D.B. also asserts a wrongful-life claim against Dr. McGoldrick. However, plaintiffs have not adequately argued or supported the basis for this claim in their brief. Nevertheless, it is clear to us that, given plaintiffs' concession that *Ho-Rath III* may have abrogated D.B.'s claim for wrongful life against Dr. Siena because D.B. was not yet conceived on February 7, 2011, when Dr. Siena provided care and treatment to Mrs. Blouin, the same analysis applies to D.B.'s wrongful-life claim against Dr. McGoldrick, who provided care and treatment to Mrs. Blouin prior to Mrs. Blouin's February 7, 2011 appointment with Dr. Siena. Therefore, our conclusions in this opinion are dispositive as to D.B.'s wrongful-life claim against Dr. McGoldrick.

of X.B. overlapped with his existence as a fetus, owed him a duty to timely diagnose X.B. with cystic fibrosis.

To prevail in a lawsuit based in negligence, a plaintiff must establish four elements: (1) a legally cognizable duty owed by defendant to plaintiff; (2) breach of that duty; (3) that the conduct proximately caused the consequent injury; and (4) actual loss, damage, or injury. *Woodruff v. Gitlow*, 91 A.3d 805, 811 (R.I. 2014). "Only when a party properly overcomes the duty hurdle in a negligence action is he or she entitled to a factual determination on each of the remaining elements * * *." *Berard*, 64 A.3d at 1219 (quoting *Holley v. Argonaut Holdings, Inc.*, 968 A.2d 271, 274 (R.I. 2009)). This Court does not apply a "bright-line rule" when deciding the existence of legal duty in a particular case. *Laprocina v. Lourie*, 250 A.3d 1281, 1288 (R.I. 2021). Rather, we have long approached the question *ad hoc* by evaluating all relevant factors. *Ferreira v. Strack*, 636 A.2d 682, 685 (R.I. 1994). In *Banks*, we outlined five factors that may be relevant to deciding whether a defendant owes a duty to a plaintiff:

> "(1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." *Banks*, 522 A.2d at 1225.

- 11 -

Relevant factors also include "the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of fairness." *Laprocina*, 250 A.3d at 1288-89 (quoting *Carlson v. Town of South Kingstown*, 131 A.3d 705, 709 (R.I. 2016)).

**Duty of Pediatric Defendants to Plaintiff-Parents**

The plaintiff-parents' first theory of liability is a novel one in Rhode Island. It implicates the duty that a pediatric care provider owes not to a minor patient, but to nonpatient biological parents as health care proxies of a minor patient. Specifically, the first theory of liability presents the following issue for our consideration: Whether pediatric care providers have a duty to timely diagnose a minor patient with a genetic disorder so that nonpatient biological parents can make informed decisions about their own undisclosed reproductive health care. We hold that pediatric care providers have no such duty.

This Court has generally exercised restraint in using the labels often associated with birth-related torts. *See Ho-Rath III*, 275 A.3d at 106 ("We are of the opinion that characterizing the suit as one for 'wrongful life' does not confer upon it a different legal status or require a different legal analysis from any other negligence or medical-negligence action."); *Emerson v. Magendantz*, 689 A.2d 409, 411, 413 (R.I. 1997) (recognizing a cause of action for the negligent performance of a sterilization procedure in cases where a patient subsequently conceives and

- 12 -

delivers a child and determining that public policy "would preclude the granting of rearing costs for a healthy child whose parents have decided to forego the option of adoption and have decided to retain the child as their own with all the joys and benefits that are derived from parenthood"). *Cf. Plowman v. Fort Madison Community Hospital*, 896 N.W.2d 393, 398 (Iowa 2017) ("Courts categorize three distinct types of claims. * * * 'Wrongful pregnancy' is a medical negligence action 'brought by the parents of a healthy, but unplanned, child against a physician who negligently performed a sterilization or abortion.' * * * 'Wrongful birth' is an action 'brought by parents of a child born with birth defects.' * * * 'Wrongful life' is a claim 'brought by the child suffering from such birth defects.'") (quoting *Nanke v. Napier*, 346 N.W.2d 520, 521 (Iowa 1984)); Mark Strasser, *Yes, Virginia, There Can Be Wrongful Life: On Consistency, Public Policy, and the Birth-Related Torts*, 4 Geo. J. Gender & L. 821, 821 (2003) ("The paradigmatic cases of wrongful conception and wrongful pregnancy involve the negligence of a health care professional resulting in the birth of a healthy infant. The paradigmatic cases of wrongful birth and wrongful life involve the negligence of a health care professional resulting in the birth of a child with severe handicaps. In cases involving wrongful conception, wrongful pregnancy, and wrongful birth, the parents seek compensation for themselves, whereas in a wrongful life case, the child through a next friend seeks compensation for himself or herself.").

Our review of relevant caselaw in other jurisdictions reveals that very few state supreme courts have considered what duty, if any, a pediatric care provider owes to nonpatient biological parents in the context of birth-related torts. *See Tomlinson v. Metropolitan Pediatrics LLC*, 412 P.3d 133, 142-43 (Or. 2018); *Molloy v. Meier*, 679 N.W.2d 711, 718-19 (Minn. 2004); *Lininger v. Eisenbaum*, 764 P.2d 1202, 1206-08 (Colo. 1988); *Schroeder v. Perkel*, 432 A.2d 834, 839-40 (N.J. 1981); *cf. M.A. v. United States*, 951 P.2d 851, 856 (Alaska 1998). Of the cases identified, only three recognize a duty to timely diagnose a minor patient with a genetic disorder so that the biological parents can make informed decisions about their own undisclosed reproductive health care. In *Molloy*, the Supreme Court of Minnesota held that the duty of a pediatric care provider regarding genetic testing and diagnosis extends beyond the minor patient to biological parents who relied on the diagnosis in their decision to conceive another child. *Molloy*, 679 N.W.2d at 719. In reaching this result, the court reasoned, in part, that "courts have drawn upon the prevailing standard of care to define the duties physicians owe in the context of genetic counseling." *Id.* at 718.

In *Tomlinson*, the Supreme Court of Oregon held that the professional relationship between pediatric care providers and a minor patient's biological parents gave rise to an obligation to protect the interests of the biological parents. *Tomlinson*, 412 P.3d at 143. In reaching that conclusion, the court considered three

aspects of the nature of the professional relationship: (1) the mutual expectation of service and reliance between the parties; (2) the lack of any interference in or impairment of the loyalty owed to the minor patient; and (3) the identifiability of the biological parents as potential plaintiffs. *Id*. at 142-43. The court also deemed persuasive the *Molloy* reasoning regarding the standard of care. *Id*. at 144.

Finally, in *Schroeder* the Supreme Court of New Jersey recognized an independent duty running from pediatric care providers to the nonpatient biological parents of a minor patient who should have been informed that their child had cystic fibrosis after considering the foreseeability of harm, to the nonpatient biological parents, of failing to disclose material information. *Schroeder*, 432 A.2d at 839-40.

The plaintiffs cite to these three cases in arguing that the foreseeability-of-harm factor under *Banks* supports a duty of care in this case. The plaintiffs assert that the harms they suffer—lost wages; loss of both earning capacity and consortium; and extraordinary medical expenses associated with caring for two children born with cystic fibrosis—were a foreseeable consequence of the pediatric defendants' failure to timely diagnose X.B. and disclose the cystic fibrosis diagnosis to plaintiffs. Once X.B. received a diagnosis of cystic fibrosis, they argue, it was foreseeable that any future child of theirs had a twenty-five percent chance of being born with the same disorder. The plaintiffs quote the following excerpt from *Schroeder* in support of their foreseeability-of-harm argument:

"The defendants should have foreseen that parents of childbearing years, such as Mr. and Mrs. Schroeder, would, in the absence of knowledge that Ann suffered from cystic fibrosis, conceive another child. They should have foreseen also that a second child could suffer from cystic fibrosis and that, if so afflicted, would sustain certain medical expenses." *Schroeder*, 432 A.2d at 839-40.

We are unpersuaded by the reasoning of the *Schroeder* court. The pediatric defendants certainly owed a duty of care to X.B., their minor patient; and they were under an obligation to communicate with plaintiff-parents as health care proxies for X.B. That obligation existed so that plaintiff-parents could make informed decisions about X.B. and for the benefit of X.B.'s care: pediatric care providers disclose timely and accurate information to the parents of their minor patients so that the parents can be good parents to their patient-children. However, there is no allegation that the delayed cystic fibrosis diagnosis caused any greater harm to X.B. than if he had been diagnosed sooner.[8] Moreover, although plaintiff-parents were in their childbearing years, there is no evidence that they discussed their reproductive health with the pediatric defendants. Thus, notwithstanding that "biological parents * * * who are already in communication with a physician about their child's medical condition, reasonably may expect to receive warnings about potential risks to them that are germane to the physician's medical diagnosis of the child[,]" *Tomlinson*, 412 P.3d

---

[8] Counsel for plaintiffs conceded at oral argument that the delay in diagnosis did not cause harm to X.B.

- 16 -

at 143, we are loath to extend that expectation into an obligation and particularly not for the purpose of involving a pediatric care provider in the undisclosed reproductive health care of a minor patient's biological parents, even if the parents are of childbearing years.

We are also unpersuaded by plaintiff-parents' reference to expert testimony by Dr. Mills that the standard of care includes timely diagnosis of a genetic condition and disclosure to a minor patient's biological parents for purposes of informed reproductive decision-making. Even accepting that testimony in the light most favorable to plaintiffs, as we must, "the existence of a duty is a question of law." *Berard*, 64 A.3d at 1218. Therefore, Dr. Mills's opinion about the standard of care has no legal significance for purposes of determining whether there is a legally cognizable duty; *Molloy* does not persuade us otherwise. *See Molloy*, 679 N.W.2d at 718 (reasoning that prevailing standard of care may inform duty of care as it relates to genetic counseling).

We acknowledge that plaintiff-parents have incurred, and will continue to incur, significant economic, emotional, and psychological costs in the aftermath of X.B. and D.B.'s cystic fibrosis diagnoses. Nevertheless, we cannot conclude that the relevant *Banks* factors, or the additional factors identified in *Laprocina*, support the imposition of a duty on the part of the pediatric defendants to have timely diagnosed X.B. with cystic fibrosis so that plaintiff-parents could have made an

- 17 -

informed decision about their own reproductive healthcare. The nexus between the failure to timely diagnose X.B. with cystic fibrosis and the harm to plaintiff-parents is attenuated; the pediatric defendants' inaction simply was not sufficiently likely to have resulted in plaintiff-parents' extraordinary economic, emotional, and psychological injuries. *Banks*, 522 A.2d at 1225, 1226-27. Moreover, the burden of such a duty would significantly outweigh whatever degree of foreseeability the pediatric defendants might have had regarding plaintiff-parents' decision to conceive and bear another child. *Laprocina*, 250 A.3d at 1289. It would unreasonably expand the pediatric defendants' zone of obligation to nonpatient biological parents of childbearing age and alter the pediatric defendants' medical practice to include genetic screening and counseling. *Id.* The complex policy implications of such burden-shifting are immense; decisions about who most appropriately bears those costs are best left to the Legislature.

Accordingly, we conclude that the trial justice did not err in determining that the pediatric defendants owed no legally cognizable duty to plaintiff-parents and that their wrongful-conception claims, as well all related derivative claims, including Q.B.'s, fail as a result.

**Duty of Obstetric Defendants to X.B. and Pediatric Defendants to D.B.**

Under the second theory of liability at issue in this appeal, X.B. and D.B. assert that the trial justice erred in determining that *Ho-Rath III* abrogated their

- 18 -

individual claims because, they argue, unlike the plaintiff in *Ho-Rath III*, the harm to X.B. caused by Dr. McGoldrick and University OB-GYN's failure to diagnose him as being afflicted or his parents as carriers of cystic fibrosis was foreseeable once X.B.'s conception was known, and it was equally foreseeable to the pediatric defendants that the failure to diagnose an elder sibling with cystic fibrosis would result in harm to D.B. We disagree.

In *Ho-Rath III*, this Court rejected the contention that, in the context of a child-plaintiff's claim, life, even a life with severe impairments or illnesses, constitutes a legally recognized injury. *Ho-Rath III*, 275 A.3d at 108. We determined that, absent an injury, there was "no future harm to be prevented by the imposition of a duty upon [the] defendants." *Id*.

The claims brought by X.B. and D.B. are no different from the claim brought by the plaintiff in *Ho-Rath III*. The temporal difference that the plaintiffs highlight—the amount of time that elapsed between the alleged inaction on the part of the defendants and when the existence of X.B. and D.B. as fetuses was known— does not alter our determination that *Ho-Rath III* controls the outcome in the instant case.[9] *Ho-Rath III*, 275 A.3d at 108.

---

[9] Moreover, we are unpersuaded by the plaintiffs' attempt to invoke the law of the case doctrine in an effort to avoid our application of the rule announced in *Ho-Rath III* to their pending appeal.

**Conclusion**

Based on the foregoing, we affirm the trial justice's decision granting the pediatric defendants' motion for summary judgment on the wrongful-conception claims and all of the defendants' motions for summary judgment on the wrongful-life claims. We affirm both judgments entered pursuant to Rule 54(b) and remand the record in this case.

Justice Goldberg did not participate.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Heather Blouin et al. v. Divya Koster, M.D., et al. |
| **Case Number** | No. 2022-282-Appeal.<br>(PC 15-3817) |
| **Date Opinion Filed** | August 20, 2024 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Ingrid Alexandra Halstrom, Esq. |
| | For Defendants:<br><br>Robert P. Landau, Esq.<br>Cassandra Allnutt DeAngelis, Esq.<br>Joshua Carlin, Esq. |